**MIRAN INVESTMENT COMPANY,**
a Corporation, Respondent,

v.

**MEDICAL WEST BUILDING CORPORA-
TION, a Corporation, Appellant.**

No. 52141.

Supreme Court of Missouri,
Division No. 2.

April 10, 1967.

Motion to Transfer to Court En Banc or for
Rehearing Denied May 8, 1967.

William R. Kirby, St. Louis, for respondent.

Rexford H. Caruthers, Guilfoil, Caruthers, Symington, Montrey & Petzall, St. Louis, for appellant.

PRITCHARD, Commissioner.

The principal issue is whether plaintiff fully performed services to defendant during construction of a medical office building, and until its completion, including "such things as the acquisition of land, securing of financing, construction of a building on an approximate cost basis, securing of leases, supervision, and other services," so as to be entitled to recover

therefor under a written contract dated August 31, 1955.

Plaintiff recovered judgment against defendant for said services $48,180, and interest from the date of filing suit, September 29, 1960, totaling $67,853.50. A jury being waived, trial was to the court.

Defendant was incorporated in 1954 for the purpose of erecting a medical office building at 950 Francis Place in Clayton, Missouri. Its incorporators were Richard J. Zoernig (defendant's president) Maryan Sheppard and Charles R. Judge (defendant's counsel, who served as secretary). Edward A. Pollack was plaintiff's president and Harold Pollack was its secretary-treasurer. The Pollacks also did business as Edward A. Pollack & Son Real Estate Company, for which plaintiff was the holding company.

Harold E. Pollack testified that in the Spring of 1955, Mr. Zoernig, Jr., came to his office and told him of a deal whereby he had contacts with doctors, with some leases already on hand, and that he would need financing to get the building. Zoernig requested a second deed of trust on the building, which Pollacks declined. They suggested to him to get a large first deed of trust to take care of the matter, to which Zoernig agreed. With the assistance of John Merle (connected with Merle-Jung, Inc., builder of the medical building), Pollack contacted several insurance companies and on July 8, 1955, a conditional commitment for a loan was received from Great West Life Assurance Company for $930,000, and a firm permanent loan commitment was obtained September 29, 1955. Prior to that, a conditional construction loan commitment was obtained August 8, 1955 from the First National Bank in St. Louis.

The written agreement was drawn by defendant's counsel, Charles R. Judge, on August 31, 1955, on which date it was executed by the parties: Medical West Building Corporation, first party; John Merle, Jr., R. W. Jung, Jr., Richard Zoernig and Miran Investment Company, second parties; and E. L. Zoernig doing business as Elco Realty Company, third party. It recites:

"Whereas, Second Parties have each rendered valuable services to First Party and will continue to so render services during the construction of a building by First Party, which said services include such things as the acquisition of land, securing of financing, construction of a building on an approximate cost basis, securing of leases, supervision, and other services, which the parties have agreed are reasonably worth, in the aggregate, the sum of One Hundred Seventy-five Thousand ($175,000.00) Dollars; and

"Whereas, First Party is desirous of providing for payment thereof to Second Parties and Second Parties are willing to accept payment in the manner agreed upon herein." It is then agreed:

"1. First Party agrees to pay and Second Parties agree to accept in full payment of all services rendered to First Party and to be rendered until the completion of a building to be erected by First Party on Francis Place in Clayton, Missouri, the sum of One Hundred Seventy-five Thousand ($175,000.00) Dollars, without interest, payable in the manner hereinafter provided.

"2. All payments made hereunder shall be made to Third Party whom Second Parties hereby irrevocably designate and appoint as their agent for the purpose of receiving such payments, with full authority to do all things in connection therewith and hereby ratifying and confirming all acts so taken.

"3. Payments to be made by First Party shall be determined as follows:

"As soon after the close of the fiscal year of First Party as its annual audit has been completed, First and Second Parties, or their authorized representa-

tives, will meet, and based upon the certified audit, will determine how much, if any, surplus cash First Party has available for distribution in accordance with this agreement. The parties agree that the term 'surplus cash' means cash over and above the cash needed for working capital and for such reserves as may be required under mortgage loan agreements, particularly with respect to prepaid or advance rental deposits. First Party agrees that, immediately upon the said determination of surplus cash, to pay the amount so determined to Third Party to apply upon the indebtedness herein.

"4. Second Parties, or any of them, may elect to purchase stock of First Party at the par value thereof and to pay for same by crediting First Party with the amount of the purchase price, thereby reducing the obligation provided for herein by such amount; provided, said election shall be made prior to the completion of the building to be erected by First Party, and provided, further that the amount of stock to be so subscribed and purchased shall not exceed Twenty-five Thousand ($25,000.00) Dollars in the aggregate.

"5. Second Parties agree to continue to devote their best efforts to the successful completion of said building."

On the same date as the written agreement, a second agreement was made dividing the $175,000 fee $65,000 to Merle and Jung, $55,000 to Richard J. Zoernig and $55,000 to plaintiff, with priority of payment to Merle and Jung. In February, 1956, defendant issued 682 shares of $10 par value stock to plaintiff, which credited $6,820 to defendant (leaving $48,180, the amount of principal claimed by plaintiff for its services, for which judgment was given below). 682 shares were also issued to Richard Zoernig and Judge, and 341 shares each were issued to E. L. Zoernig, John Merle and R. W. Jung. Over defendant's objection on the ground that it would

violate the parol evidence rule, because the agreement of August 31, 1955 contemplated further services, and the purpose of the answer was to show the agreements fully performed, Pollack was permitted to testify that the $55,000 commission for plaintiff was based upon 3% of the permanent loan and a similar amount for the temporary loan. The issuance of defendant's stock was done pursuant to a third agreement also of August 31, 1955, whereby the second parties and the third party to the first, basic agreement agreed to subscribe to 51% of defendant's stock, to be paid for out of credits for services rendered and to be rendered by the parties thereto.

The completion date of construction of the medical building was specified to be May 1, 1956 (the building then was barely out of the ground). Zoernig had difficulty with leasing, and Merle-Jung, Inc. was confronted with strikes, material shortages, and cost problems with regard to who was to pay for partitions (walls) in the leases during construction. Plaintiff, on August 20, 1956, accomplished a necessary extension of the construction loan to December 5, 1956, and on August 21, 1956 was successful in having the commitment for permanent financing extended to June 1, 1957. Shortly before December 5, 1956, the First National Bank advised that it would not extend the construction loan unless the controlling stockholders would personally guarantee interest and pledge the controlling stock. At that time $729,000 had been drawn against the total commitment. The interest rate was 5½% per annum, and there was on hand, after payment of interest to December 5, 1956, $1,099.60 for that purpose, held by the Lawyers Title Company of Missouri, disbursing agent of construction money. It was agreed by witnesses for both parties that at that time defendant was broke. The unfinished building, its only asset, was threatened with foreclosure. There was no money on hand to complete the building; taxes for 1956 were unpaid; there was due Giraldin Brothers a loan commission; to Lawyers

Title Company fees for disbursal and title service, and to Merle-Jung, Inc., money for extras in preparing doctors' suites for occupancy.

The First National Bank had prepared a form of guaranty and pledge agreement of defendant's stock, in accordance with its announced intention not to extend the construction loan without such guaranty and pledge. This form was brought to the Pollacks by John Merle on December 6, 1956, but the Pollacks made a decision not to join the agreement, but did agree to surrender plaintiff's stock in defendant (by letter dated December 6, 1956, "This is to inform you that effective this date the undersigned relinquishes all their stock in the Medical West Corp. and will turn in the stock certificate to your office tomorrow morning."), which stock was delivered to Judge the next morning. The stock was reissued and delivered to the bank with the guaranty and pledge agreement which was executed by Merle, Jung, Richard Zoernig, E. L. Zoernig and Judge on December 7, 1956. These guarantors were called upon to advance money for interest, totaling about $5,500, in January, February and March, 1957.

When Edward A. Pollack turned over plaintiff's stock to Merle for delivery to Judge, he testified that he told them "that is as far as we'll go and that's all." On Friday, December 7, 1956, Judge wrote to the Pollacks that "Under these circumstances, since you have decided not to participate in the guaranty, your stock-holdings and claims against the corporation stand surrendered to the participating stockholders." On December 10, 1956, Harold Pollack called Merle and denied that they had surrendered their fee by surrendering plaintiff's stock, and a letter of December 12, 1956 to Judge set forth the same denial. Contra to Pollack's testimony, Merle testified that the Pollacks had (verbally) forfeited their fees. Judge testified that Edward Pollack told him in their telephone conversation that "I feel awfully bad about this when I think of all the hard work and time we put into this and now its all wasted. We can't realize anything out of it and all that hard work is gone; it's wasted," and "they wouldn't be able to recoup or recover anything for it."

After December 6, 1956, the Pollacks took no further part in defendant's affairs. Defendant never called upon plaintiff to procure additional financing or advise it as to leases. The other original participants continued to render services to defendant; in February and March, 1957, a few tenants moved into the building; through E. L. Zoernig & Co., defendant sold a $50,000 debenture issue, the proceeds of which were used to pay 1956 taxes, Giraldin Brothers its approximate $14,000 loan commission, Lawyers Title Company for title services, and Merle-Jung, Inc. for extras on the building. The building was completed in June, 1957, and the permanent financing was taken down at that time. Subsequently, in February, 1958, defendant's controlling stockholders sold their stock to O. S. and Ann Rudman by separate contracts. Merle and Jung assigned their claim against defendant to Rudmans. The Zoernigs' contract called for the Rudmans to cause defendant to pay Richard Zoernig his contract fee balance of $47,580 in six annual equal installments, and to advance money necessary therefor. After litigation that claim was settled for $20,000. Charles R. Judge filed suit for his attorney's fee. O. S. Rudman testified that defendant operated at a loss and had no surplus.

At the trial, plaintiff's contention was that its sole obligation was to obtain financing, which was satisfied upon getting loan commitments before the contract was made, on August 31, 1955, and that its services thereafter were gratuitous. Defendant's contention was that the agreement sued upon required continuing services until the successful completion of its building; that plaintiff had not performed its obligation or tendered performance; and that abandonment and rescission occurred on December 6, 1956 (to which plaintiff disagreed).

The trial court's findings included: (1) That there was no abandonment or rescission by plaintiff of the agreements of August 31, 1955; (2) that defendant failed to show a clear enforceable agreement supported by a consideration to constitute an abandonment or rescission of the original contracts; (3) that plaintiff did not violate the contract by failing to continue to render services; and (4) that "It is a reasonable inference from the evidence that the building was in fact completed as contracted for with Medical West Corporation by this group."

Without doubt, the express written contract (upon which plaintiff sued) required it to continue to render services during the construction of the building (Paragraph 1 of the basic agreement, supra) and "to continue to devote their best efforts to the successful completion of said building." (Paragraph 5 of the basic agreement, supra.) The record shows that plaintiff (through the Pollacks) did help in arranging the initial $930,000 construction loan (and the extension to December 6, 1956) and the permanent loan, and it is not disputed that the "Pollacks did participate actively in the affairs of defendant until December 6, 1956, that on that date they surrendered plaintiff's stock and refused to participate in the guaranty and pledge agreement that First National Bank required as a condition to extend the then matured construction loan of defendant." After December 6, 1956, the Pollacks (on behalf of Miran Investment Company) did not participate any further in defendant's affairs. They were not asked. The leasing of the offices was handled by the Zoernigs, with some conferences with the Pollacks in regard to how much to charge doctors for installing partition walls.

█ It is true that proof of performance or tender of performance is necessary to the recovery upon an express contract, as here. Hellrung v. Hoechst, Mo., 384 S.W.2d 561, 564 [5]; Rosen v. Alside, Inc., Mo., 248 S.W.2d 638, 643 [7]; Kreitz

v. Egelhoff, 231 Mo. 694, 132 S.W. 1124, 1127. The issue is, however, just what performance plaintiff was to accomplish under the written contract. It seems that defendant's position is that there was a breach of the contract by plaintiff in that it failed to join in the written guaranty of interest to the bank, which would prevent recovery under defendant's above-cited cases. There is nothing in the August 31, 1955 agreement for services which would require plaintiff to assume a personal obligation in the securing of financing for defendant. Harold E. Pollack testified that in the function of securing financing it is not usual that personal obligation be furnished. The fact that the others in the venture were willing (as stockholders) personally to guarantee the interest payments to the bank (in addition to assigning their stock) is not binding upon plaintiff—it was not obligated to do so. By requesting such guaranty, the others imposed a condition upon plaintiff's obligation to furnish services in securing financing which was not present in the original agreement. Such a condition cannot be implied, as defendant seems to suggest in its brief statement, "While it may be true, as the trial court pointed out, that the contract imposed no direct obligation on plaintiff or the Pollacks to 'undertake any personal financial burden,' it did impose on the second parties as a group, or on plaintiff specifically, the obligation to secure financing and Harold Pollack testified that the stockholders constituted the only source of financing." Under the circumstances here appearing, there was no breach of performance by plaintiff of any part of the August 31, 1955 agreement. The record shows that plaintiff did substantially perform its services in securing financing, and extensions of loan commitments up to at least December 6, 1956. It then turned over its stock which had been issued to it as a credit upon services rendered. Defendant's contention of failure of performance is denied.

█ It was for the trial court to resolve the conflicting testimony of the Pol-

lacks and Merle as to whether there occurred a verbal rescission and abandonment of the contract on December 6, 1956. Deference is to be accorded his finding that the Pollacks, acting for plaintiff, did not surrender its claim against defendant as well as the stock surrender. There is merit in plaintiff's contention that the contended surrender of the claim is without consideration. Thumm v. Lohr, Mo.App., 306 S.W.2d 604, 609 [8–13], and cases cited, holding that "the surrender of a valuable right under a contract is ineffectual unless supported by a valuable consideration." Plaintiff here possessed a valuable right to be compensated under the contract for services rendered and to be rendered until the medical building was "successfully completed." That contract was not wholly executory, so that a mutual agreement of the parties would be sufficient to set it aside without consideration. Thumm v. Lohr, supra. There is no consideration for such surrender of claim to be found in plaintiff being relieved of the obligation to perform (services in securing financing) under the contract as contended by defendant. As stated, on December 6, 1956, a condition of assuming personal obligation was imposed upon plaintiff, which was not present in the initial agreement. Nor do the subsequent events and acts of the Pollacks establish an abandonment under this record. "[A]bandonment must be made to appear affirmatively by the party asserting it, and that proof of abandonment must be made by clear, unequivocal and decisive evidence." Sanitary Systems, Inc. v. American Surety Co. of New York (CCA8), 331 F.2d 438, 440. "It is a fact made up of an intention to abandon, and the external act by which the intention is carried into effect." Pocoke v. Peterson, 256 Mo. 501, 165 S.W. 1017, 1021. See also Schwartz v. Shelby Construction Co., Mo., 338 S.W.2d 781, 788. Defendant, through its agents, repudiated the contract, which terminated the duty of plaintiff further to perform. Landau v. St. Louis Public Service Company, 364 Mo. 1134, 273 S.W.2d 255, 48 A.L.R.2d 1200.

Defendant says that plaintiff may not recover because it failed to tender performance (in securing financing) *on* December 6, 1956 (when it was critically needed). It agrees "that tender of performance *after* December 6, 1956, would have served no useful purpose, not for the reason assigned by the court [that defendant took the unequivocal position that the Pollacks and Miran Investment Company had forfeited all rights arising out of the contracts], but because the time for performance or tender was *on* December 6, 1956, not *after* that date." (Bracketed phrase added.) The difficulty with that contention is that plaintiff was not given the opportunity to perform anything in accordance with the original writing with respect to securing financing. Plaintiff did not have to tender a performance of something it had not bound itself to do, i. e., personally to guarantee the payment of interest, on December 6, 1956. Nothing was presented to the Pollacks but the form of guaranty prepared by the bank; no other demand for financing was made; the original agreement was prepared to be signed by the Pollacks individually, not plaintiff. The Pollacks did suggest depositing of cash, but other stockholders could not raise their share. On December 7, 1956, Charles R. Judge wrote to the Pollacks that by surrendering plaintiff's stock (necessary to satisfy the bank's subsequent demand after it finally rejected the offer to deposit cash) they also surrendered their right to the fee. By telephone, Harold E. Pollack denied to Merle that they had surrendered their fee. The same denial was contained in a letter to Judge, dated December 12, 1956. Thereafter, the Pollacks did not know what was going on. They were asked to do nothing, nor were they informed of the subsequent need for advances (supplied by the guarantors and a debenture issue through E. L. Zoernig & Co.) to complete the building and pay debts. "A tender is waived where the tenderee makes any declaration which amounts to a repudiation of the contract, or takes any position which would render a tender, so long as the po-

sition taken by him is maintained, a vain and *ideal* (idle) ceremony, * * *." 17A C.J.S. Contracts § 481, p. 680. See also: 17 Am.Jur.2d Contracts, § 358, p. 797, et seq.; Cable v. Wilkins, Mo.App., 352 S.W. 2d 50, 53; Stein v. Bruce, Mo.App., 366 S.W.2d 732, 734 [1, 2].

■ Defendant says that even if an obligation (to pay defendant's fee) had arisen, no money would have become due and payable because the basic agreement provided for payment only out of "surplus cash," and the evidence shows that defendant at no time has been possessed of such surplus cash. Plaintiff's position is that the provision for surplus cash payments at best related to the method of payment of what was due the parties of the second part; that by paying Merle-Jung, Inc., and settling with Zoernig (for $20,000) made the "surplus cash" provision inoperative, and defendant waived it as a requirement of method of payment (note that Paragraph 1 of the agreement provides that the fee be "payable in the manner hereinafter provided"); that the recitals are that first party is desirous of providing for payment to second parties who are willing to accept payment in the manner agreed upon herein; there is no provision that the fee be paid *only* out of surplus cash; credit would be given on the fee if the option to purchase defendant's stock were exercised. The provision is not a condition precedent, unfavored in the law, which would work a forfeiture. 17 Am.Jur.2d Contracts, § 321, pp. 751, 752, and § 339, pp. 776, 777. And see C. J. Hogan, Inc. v. Atlantic Corporation, Mass., 332 Mass. 322, 124 N.E.2d 905, 909, " * * * It is generally held that an existing obligation does not lose its absolute character and become a conditional one just because a subsequent agreement of the parties postpones payment until the happening of some specified contingency wholly, or even partly, *within the obligor's control.*" (Italics added.) Defendant's cited case of Mitchell v. Health Culture Co., 349 Mo. 475, 162 S.W.2d 233, being one holding that a note provision that it was

payable out of a trust fund of allocated income excluded negotiability, is not applicable. The trial court did not err in awarding a money judgment.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.